*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

**Electronically Filed
Supreme Court
SCAP-23-0000310
12-SEP-2025
08:56 AM
Dkt. 19 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

HILO BAY MARINA, LLC and KEAUKAHA MINISTRY LLC,
Plaintiffs-Appellants,

vs.

STATE OF HAWAI'I; BOARD OF LAND AND NATURAL RESOURCES,
STATE OF HAWAI'I,
Defendants-Appellees.

SCAP-23-0000310

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CAAP-23-0000310; CASE NO. 3CCV-22-0000095)

SEPTEMBER 12, 2025

RECKTENWALD, C.J., McKENNA, EDDINS, GINOZA, AND DEVENS, JJ.;
WITH EDDINS, J., CONCURRING SEPARATELY,
WITH WHOM McKENNA AND DEVENS, JJ., JOIN;
AND DEVENS, J., ALSO CONCURRING AND DISSENTING

OPINION OF THE COURT BY GINOZA, J.

## I. INTRODUCTION

This appeal arises from a 1922 Land Patent issued by

the Territory of Hawai'i (**Territory**) to the trustee of a

religious organization for certain lands located on Hawai'i

Island (the **Property**).[1]  The Land Patent contains a deed restriction that the Property must be used "for Church purposes only" and that, if the Property is used for other purposes, the land grant is voided and the Property reverts to the Territory (**Deed Restriction**).

Following the initial 1922 conveyance, the Property was transferred to different owners via private land transactions that occurred in 1988, 2000, and 2015, each referencing the original Land Patent.  There is no dispute that the Deed Restriction and reversionary interest carried over with each transaction.

Plaintiffs-Appellants Hilo Bay Marina, LLC (**Hilo Bay**) and Keaukaha Ministry, LLC (**Keaukaha Ministry**) (collectively, **Appellants**) are the current owners of the Property.[2]  Appellants filed this action against Defendants-Appellees State of Hawai'i and the State of Hawai'i Board of Land and Natural Resources (collectively, the **State**) in the Circuit Court of the Third Circuit[3] (**Circuit Court**), asserting that the State refuses to remove the Deed Restriction and continues to assert that it is

---

[1]     The Property encompasses present day Tax Map Key (**TMK**) Numbers (3)2-1-014:25, 29, 30, 31, 60 and 74.

[2]     Hilo Bay owns TMK Nos. (3)2-1-014:29, 30, 31, 60, and 74 and Keaukaha Ministry owns TMK No. (3)2-1-014:25.

[3]     The Honorable Henry T. Nakamoto presided.

enforceable.  Appellants contend that the Deed Restriction is void under Hawaiʻi Revised Statutes (**HRS**) § 515-6(b) (2018);[4] violates the Hawaiʻi Establishment Clause in article I, section 4 of the Hawaiʻi Constitution;[5] and violates the Federal Establishment Clause in the First Amendment to the United States Constitution.[6]

The parties filed cross-motions for summary judgment (**MSJ**) in the Circuit Court.  The Circuit Court entered summary

---

[4]    HRS § 515-6(b) (2018) provides that:

(b)    Every condition, restriction, or prohibition, including a right of entry or possibility of reverter, that directly or indirectly limits the use or occupancy of real property on the basis of race, sex, including gender identity or expression, sexual orientation, color, religion, marital status, familial status, ancestry, disability, age, or human immunodeficiency virus infection is void, <u>except a limitation, on the basis of religion, on the use of real property held by a religious institution or organization or by a religious or charitable organization operated, supervised, or controlled by a religious institution or organization, and used for religious or charitable purposes</u>.

(Emphasis added.)  The emphasized portion of the statute is referred to as the "exemption clause."

[5]    Article I, section 4 of the Hawaiʻi Constitution provides in relevant part that: "No law shall be enacted respecting an establishment of religion, or prohibiting the free exercise thereof[.]"

Appellants' Second Amended Complaint also alleged that the Deed Restriction violated article VII, section 4 of the Hawaiʻi Constitution, which states in relevant part that: "No grant shall be made in violation of Section 4 of Article I of this constitution."  Article VII, section 4 is titled "Appropriations For Private Purposes Prohibited."  However, on appeal, Appellants do not raise any issue under article VII, section 4 of the Hawaiʻi Constitution.

[6]    The Federal Establishment Clause provides that: "Congress shall make no law respecting an establishment of religion[.]"  U.S. Const. amend. I, § 1.

judgment for the State, concluding that the Territory's sale of government lands with deed restrictions was an early form of use-zoning; and that the Deed Restriction in this case did not violate any of the laws asserted by Appellants.

Appellants appealed to the Intermediate Court of Appeals (**ICA**). We granted transfer to this court.

We conclude that the State's enforcement of the Deed Restriction violates the Hawai'i Establishment Clause in article I, section 4 of the Hawai'i Constitution. We therefore reverse the Circuit Court's Final Judgment on those grounds.

## II. BACKGROUND

### A. Factual Background

In 1922, Governor Wallace Farrington sold the 3.99-acre Property via Land Patent No. 8039 to Heber J. Grant, Trustee for the Church of Jesus Christ of Latter-Day Saints (**LDS Church**). The Land Patent stated in part:

> By this Patent the Governor of the Territory of Hawaii, in conformity with the laws of the United States of America and of the Territory of Hawaii, and in conformity with the provisions of Section 73 of the Hawaiian Organic Act, and in pursuance of the provisions of Section 357 of the Revised Laws of the Territory of Hawaii of 1915, makes known to all men that he has this day granted and confirmed unto HEBER J. GRANT, TRUSTEE In Trust for the Church of Jesus Christ of Latter-Day Saints for the consideration of TWENTY Dollars, $20.00, paid into the Treasury, all of the land situate at KEAUKAHA, WAIAKEA in the District of SOUTH HILO Island of HAWAII bounded and described as follows[.]

(Formatting altered.) The Land Patent further contained the Deed Restriction, which stated:

Subject to the following:

The land covered by this Grant is to be <u>used for Church purposes only</u>.  In the event of its being used for other than Church purposes, this Grant shall become <u>void</u> and the land mentioned herein shall <u>immediately revert to and revest in the Territory of Hawaii</u>[.]

(Emphases added.)  The Land Patent was signed by Governor Farrington and the Commissioner of Public Lands.

On December 16, 1988, the LDS Church conveyed the Property to Deseret Title Holding Corporation by Warranty Deed.

On September 6, 2000, Property Reserve, Inc., formerly known as Deseret Title Holding Corporation, conveyed the Property to Hilo Bay by Quitclaim Deed.[7]

On May 5, 2015, Hilo Bay conveyed a portion of the Property, TMK No. (3)2-1-014:25, to Keaukaha Ministry by Warranty Deed.[8]

Appellants claim, without dispute from the State, that they are the fee-simple owners of the Property.  They assert that after years of attempted negotiations with the State, they filed this lawsuit seeking a ruling that the Deed Restriction is invalid and/or unenforceable.

---

[7]     The 2000 Quitclaim Deed to Hilo Bay was recorded with the State of Hawaiʻi Bureau of Conveyances on September 6, 2000.

[8]     The 2015 Warranty Deed to Keaukaha Ministry was recorded with the State of Hawaiʻi Bureau of Conveyances on May 5, 2015.

The State defends the validity of the Deed Restriction, asserting its right to enforce it under the Land Patent.

**B.    Circuit Court Proceedings**

**1.    Appellants' Complaint(s)**

On April 5, 2022, Appellants filed their Complaint for Declaratory Relief against the State in the Circuit Court. Appellants subsequently filed two amended complaints.

Appellants' Second Amended Complaint sought judgment declaring that the Deed Restriction is unenforceable because it violates: HRS § 515-6(b); the Hawai'i Establishment Clause in article I, section 4 of the Hawai'i Constitution; article VII, section 4 of the Hawai'i Constitution; and the Federal Establishment Clause in the First Amendment to the United States Constitution.

Appellants' Second Amended Complaint at paragraphs 5 and 9 asserts:

> 5.    The State has refused to remove the Church purposes restriction and reversionary interest from the properties and continues to claim that the clause is enforceable and the properties should revert to the State if the restriction is not satisfied.
>
> . . . .
>
> 9.    State is the State of Hawaii as successor to the Territory of Hawaii and purports to hold a reversionary interest in at least a portion of the Property.

6

The State admitted paragraphs 5 and 9 in answering the Second Amended Complaint.

## 2. The Parties' Cross-MSJs

In November 2022, the parties filed cross-MSJs.

### a. Appellants' MSJ

In their MSJ, Appellants argued they were entitled to summary judgment because there were no genuine issues of material fact, and the only issues before the court were legal issues. Appellants asserted four arguments in support of their MSJ.

First, Appellants asserted that the general voidance clause in HRS § 515-6(b) voids the Deed Restriction because the restriction improperly limits the use of real property on the basis of religion, in violation of the statute. Appellants also asserted that the exemption clause in HRS § 515-6(b) is inapplicable because it is a "narrow exception" that allows religious institutions to restrict the use of their own property. Appellants argued that because the State imposed the Deed Restriction - rather than a religious institution - the Deed Restriction was void at its inception (even though HRS § 515-6(b) did not exist at that time).

Second, Appellants asserted that the Deed Restriction violated the Hawai'i Establishment Clause, as well as article VII, section 4 of the Hawai'i Constitution. Appellants argued

7

that the applicable test for violations of the Hawai'i Establishment Clause is the three-part test articulated by the U.S. Supreme Court in Lemon v. Kurtzman, 403 U.S. 602 (1971). Appellants maintained that under Lemon, the Deed Restriction violated the Hawai'i Establishment Clause because it (1) lacks a secular purpose, (2) improperly advances religion, and (3) excessively entangles the State with religion.

In support of their contention that Lemon applies to challenges under the Hawai'i Establishment Clause, Appellants argued that Lemon has been both applied by this court in Koolau Baptist Church v. Department of Labor & Industrial. Relations, 68 Haw. 410, 718 P.2d 267 (1986),[9] and considered by the Hawai'i Legislature during the Constitutional Convention of 1978. Regarding their latter assertion, Appellants attached excerpts of the 1978 Constitutional Convention Studies (**1978 Studies**) that were drafted by the Legislative Reference Bureau (**LRB**). Appellants asserted that the 1978 Studies' reference to Lemon as the applicable test under the Federal Establishment Clause indicates that the Hawai'i Legislature intended Lemon to be the applicable test for the Hawai'i Establishment Clause.

---

[9]     Contrary to Appellants' suggestion, this court's decision in Koolau Baptist did not address article I, section 4 of the Hawai'i Constitution.  Rather, that case dealt with the Federal Establishment Clause. Koolau Baptist, 68 Haw. at 412, 419, 718 P.2d at 268, 273.

8

Third, Appellants argued that the Deed Restriction violated the Federal Establishment Clause, pursuant to the U.S. Supreme Court's decision in Kennedy v. Bremerton School District, 597 U.S. 507 (2022). Appellants asserted that under Kennedy, the Deed Restriction is unenforceable because it is unconstitutionally coercive and forces Appellants to participate in religion or forfeit their ownership rights.

Finally, Appellants argued that the Circuit Court could not enforce the Deed Restriction because doing so would constitute state action in violation of the Fourteenth Amendment to the U.S. Constitution, pursuant to Shelley v. Kraemer, 334 U.S. 1 (1948).

### b. The State's MSJ

In its cross-MSJ, the State asserted that it is entitled to summary judgment because the Deed Restriction constitutes a primitive form of use-zoning and a valid exercise of the State's police powers. The State asserted three arguments in support of its MSJ.

First, the State argued that HRS § 515-6(b) did not void the Deed Restriction. The State claimed that the exemption clause in HRS § 515-6(b) applied, and that it does not specify the grantor for purposes of the exemption. Thus, according to the State, the statute does not prohibit anyone - including the State and its predecessor Territory - from being the grantor of

9

such a restriction, as long as the grantee is the one enumerated in the exemption.

Second, the State argued that the Deed Restriction does not violate the Federal Establishment Clause because it constitutes an exercise of the State's police power, and comports with historical use-zoning practices and understandings of use-zoning practices in 1922, pursuant to Kennedy.  In support of this argument, the State attached multiple exhibits, including seventeen land patents with similar deed restrictions, and ten maps dated between 1901-1923, allegedly showing how land was subdivided and zoned during the territorial days.  Sixteen of the land patent exhibits, including the subject Land Patent, were issued to churches or their respective trustees, between the years 1921 and 1925.  The State maintained that the Territorial Government's early form of use-zoning through sales of land with deed restrictions is similar to current special-use permitting, which has passed constitutional muster.

Third, the State argued that the Hawai'i Establishment Clause and the Federal Establishment Clause are "coextensive," such that the applicable test for analyzing whether the Deed Restriction passes muster under article I, section 4 of the Hawai'i Constitution, is the "historical practices and understandings test" articulated by the U.S. Supreme Court in Kennedy.  The State further asserted that even if the Lemon test

10

applied to the Hawai'i Establishment Clause - as suggested by Appellants - the Deed Restriction would still pass constitutional muster because it was created for the secular purpose of zoning.

The parties filed cross-memoranda in opposition to each other's MSJs, asserting various arguments and counterarguments, none of which are dispositive to our holding in this case.

### 3.    The Circuit Court's Ruling

On March 21, 2023, the Circuit Court entered its Summary Judgment Order granting summary judgment in favor of the State, and against Appellants.  In this order, the Circuit Court made findings of fact (**FOF**) and conclusions of law (**COL**).

The Circuit Court "found," at FOF 3, that "[t]he Territory of Hawai'i engaged in an early form of use-zoning through the sale of land with deed restrictions, including the sale of government lands to religious organizations."

The Circuit Court also made the following COLs:

HRS § 515-6(b)

10.    HRS § 515-6(b) states:

> Every condition, restriction, or prohibition, including a right of entry or possibility of reverter, that directly or indirectly limits the use or occupancy of real property on the basis of race, sex, including gender identity or expression, sexual orientation, color, religion, marital status, familial status, ancestry, disability, age, or human immunodeficiency virus

11

> infection is void, except a limitation, on the basis of religion, on the use of real property held by a religious institution or organization or by a religious or charitable organization operated, supervised, or controlled by a religious institution or organization, and used for religious or charitable purposes.

*Id.*

11.  HRS § 515-6(b) provides an exemption that permits any party to reserve a covenant for religious use when transacting with a religious organization.

12.  The [D]eed [R]estriction "for Church purposes only" is included in the exemption clause of HRS § 515-6(b).

13.  HRS § 515-6(b) does not void the [D]eed [R]estriction.

First Amendment of the United States Constitution

14.  The Establishment Clause of the First Amendment of the United States Constitution does not "'compel the government to purge from the public sphere' anything an objective observer could reasonably infer endorses or 'partakes of the religious.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2427 (2022) (internal citations omitted).

15.  The Establishment Clause "must be interpreted by 'reference to historical practices and understandings.'" *Id.* at 2428 (internal citations omitted).

16.  The State's police powers grant it broad discretion to zone unless a court finds that a policy is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Vill. of Euclid, Ohio v. Ambler Realty Co.,* 272 U.S. 365, 395 (1926).

17.  The location of religious institutions is implicated in zoning practices.

18.  The practice of selling government lands with deed restrictions was an early form of use-zoning and is interpreted as a historical practice of zoning. *Kennedy*, 142 S. Ct. at 2427.

19.  The [D]eed [R]estriction does not violate the Establishment Clause of the United States Constitution. *Id.*

12

Article I, § 4 of the Hawai'i Constitution

20.  Article I, § 4 of the [Hawai'i] Constitution is coextensive with the First Amendment of the United States Constitution.

21.  The [D]eed [R]estriction does not violate Article I, § 4 of the Hawai'i Constitution for the same reasons that it does not violate the Establishment Clause of the First Amendment of the United States Constitution.

22.  Because the [D]eed [R]estriction does not violate Article I, § 4 of the Hawai'i Constitution, it cannot be construed as a grant in violation of Article I, § 4; thus, there is no violation of Article VII, § 4.

23.  Even if Article I, § 4 of the Hawai'i Constitution is not coextensive with the Establishment Clause of the First Amendment of the United States Constitution, the [D]eed [R]estriction passes Constitutional muster under *Lemon v. Kurtzman*, which requires that government policies (1) have a secular purpose; (2) do not endorse or approve of religion; and (3) do not create excessive entanglement with religion.  403 U.S. 602, 620 (1971).

24.  The [D]eed [R]estriction had a secular purpose of zoning.  *Id.*

25.  The [D]eed [R]estriction allows for any religious organization to benefit from the [P]roperty, so it does not endorse or approve one religion over another.  *Id.*

26.  Not every form of government surveillance and monitoring reaches this degree, and routine administrative or compliance activities do not constitute impermissible "interference of. . . secular authorities in religious affairs."  *Cammack v. Waihee*, 932 F.2d 765, 780 (9th Cir. 1991).

27.  The surveillance and monitoring required to enforce the [D]eed [R]estriction do not present excessive entanglement because they are no different than that of what is required to enforce any other zoning regulation.

On April 13, 2023, the Circuit Court entered its Final Judgment in favor of the State, and against Appellants.

13

## C. Appellate Proceedings

On April 24, 2023, Appellants appealed to the ICA. During the briefing period, we granted transfer to this court.

On appeal, Appellants contend that the Circuit Court erred when it concluded that: (1) the practice of selling government lands with deed restrictions was an early form of use-zoning and is interpreted as a historical practice of zoning (**COL 18**); (2) HRS § 515-6(b) does not void the Deed Restriction (**COL 13**); (3) the Deed Restriction does not violate the Hawai'i Establishment Clause for the same reasons that it does not violate the Federal Establishment Clause (**COL 21**), and even if the Hawai'i Establishment Clause is not coextensive with the Federal Establishment Clause, the Deed Restriction passes constitutional muster under Lemon (**COL 23**); and (4) the Deed Restriction does not violate the Federal Establishment Clause (**COL 19**).

In support of their points of error on appeal, Appellants raise largely the same arguments and supporting authority asserted in their MSJ.  In brief, Appellants argue that the State lacks any evidence - or explanatory connection - to support its claim that the Territory of Hawai'i used deed restrictions historically as an early form of use-zoning. Appellants further assert that HRS § 515-6(b) voids the Deed Restriction because the restriction limits the use of real

14

property on the basis of religion, and the statute's exemption clause is inapplicable because the Property is not "held by a religious institution."

With respect to their constitutional arguments, Appellants maintain that Lemon is the controlling test for challenges under the Hawaiʻi Establishment Clause, and that under Lemon, the Deed Restriction must fail. Appellants also assert that the Deed Restriction violates the Federal Establishment Clause under Kennedy and its predecessor Federal Establishment Clause jurisprudence.

In its responsive appellate briefing, the State reasserts the arguments it raised in the Circuit Court. The State contends that the Circuit Court's Summary Judgment Order and Final Judgment should be affirmed.

### III. STANDARDS OF REVIEW

**A. Summary Judgment**

We review the Circuit Court's grant or denial of summary judgment *de novo*. Hawaii Cmty. Fed. Credit Union v. Keka, 94 Hawaiʻi 213, 221, 11 P.3d 1, 9 (2000). The standard for granting a motion for summary judgment is settled:

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the

15

> parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

Id. (citations and internal quotation marks omitted) (formatting altered).

We have further explained the burdens of the moving and non-moving parties on summary judgment as follows:

> The burden is on the party moving for summary judgment (moving party) to show the absence of any genuine issue as to all material facts, which, under applicable principles of substantive law, entitles the moving party to judgment as a matter of law. This burden has two components.
>
> First, the moving party has the burden of producing support for its claim that: (1) no genuine issue of material fact exists with respect to the essential elements of the claim or defense which the motion seeks to establish or which the motion questions; and (2) based on the undisputed facts, it is entitled to summary judgment as a matter of law. Only when the moving party satisfies its initial burden of production does the burden shift to the non-moving party to respond to the motion for summary judgment and demonstrate specific facts, as opposed to general allegations, that present a genuine issue worthy of trial.
>
> Second, the moving party bears the ultimate burden of persuasion. This burden always remains with the moving party and requires the moving party to convince the court that no genuine issue of material fact exists and that the moving part is entitled to summary judgment as a matter of law.

French v. Hawaii Pizza Hut, Inc., 105 Hawaiʻi 462, 470, 99 P.3d 1046, 1054 (2004) (citation and emphasis omitted). This court has prescribed detailed guidance regarding how a moving party may satisfy its initial burden on a motion for summary judgment, providing that:

> a summary judgment movant may satisfy [their] initial burden of production by either (1) producing admissible evidence to show there was no genuine issue of material fact, or (2) showing that the non-moving party cannot carry

16

> [their] burden of proof at trial. . . . [T]he movant
> generally cannot support its initial burden of production
> by pointing solely to the non-moving party's lack of
> evidence if discovery has not concluded.

Ralston v. Yim, 129 Hawai'i 46, 48, 292 P.2d 1276, 1278 (2013) (citation omitted).

Here, the Circuit Court made findings of fact, but we are reviewing that court's summary judgment rulings.[10] The Circuit Court did not have an evidentiary hearing. Therefore, we are not bound by the Circuit Court's "findings" even if they are unchallenged.[11] See Malulani Grp., Ltd. v. Kaupo Ranch,

---

[10] Appellants do not challenge the Circuit Court's FOF 3 ("The Territory of Hawai'i engaged in an early form of use-zoning through the sale of land with deed restrictions, including the sale of government lands to religious organizations"). Appellants' four points of error cite to and challenge the Circuit Court's "conclusions of law." However, Appellants treat COL 18 ("The practice of selling government lands with deed restrictions was an early form of use-zoning and is interpreted as a historical practice of zoning") as a "finding of fact," arguing that there is no "substantial evidence" to support this holding. Under summary judgment standards, the question is whether there are any genuine issues of material fact regarding this finding.

[11] Hawai'i Rules of Civil Procedure (**HRCP**) Rule 56 governs summary judgment, and provides, in relevant part, that summary judgment:

> [s]hall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

HRCP Rule 56(c) (eff. 2000) (emphasis added). HRCP Rule 52 governs findings by the court, and provides that: "Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in subdivisions (b) and (c) of this rule." HRCP Rule 52(a) (eff. 2000). The purpose of deciding summary judgment motions is to determine whether material factual disputes exist, not to resolve them. See Rodriguez v. Nishiki, 65 Haw. 430, 439, 653 P.2d 1145, 1151 (1982) ("It is not within the province of the trial court at summary judgment to resolve factual disputes."); Dalton v. City & Cnty. of Honolulu, 51 Haw. 400, 403 n.2, 462 P.2d 199, 202 n.2 (1969) ("[D]isputed issues of fact cannot be resolved on summary judgment." (citation omitted)).

Ltd., 133 Hawai'i 425, 430 n.4, 329 P.3d 330, 335 n.4 (App. 2014) (reviewing the circuit court's grant of summary judgment, and noting that "because the circuit court was addressing a summary judgment motion, and did not hold any type of evidentiary hearing, we apply the usual summary judgment principles and are not bound by the circuit court's findings, regardless of whether those findings are challenged on appeal or not"). Rather, we apply summary judgment standards, meaning that we review the record *de novo* and "[t]he evidence must be viewed in the light most favorable to the non-moving party[.]" Keka, 94 Hawai'i at 221, 11 P.3d at 9 (citation and internal quotation marks omitted). "The burden is on the party moving for summary judgment (moving party) to show the absence of any genuine issue as to all material facts, which, under applicable principles of substantive law, entitles the moving party to judgment as a matter of law." French, 105 Hawai'i at 470, 99 P.3d at 1054 (citation omitted).

---

Thus, although it may be helpful for a trial court to make findings that specific material facts are uncontested, such findings – even if unchallenged on appeal - do not bind this court nor alter our *de novo* standard of review. See 10A Wright & Miller's Federal Practice & Procedure § 2716 (4th ed. 2025) ("In considering an appeal from the disposition of a Rule 56 motion, the appellate court normally will not have the district court's findings of fact and conclusions of law on the motion before it since Rule 52(a)(3) makes these findings unnecessary on summary judgment motions.") (footnotes omitted); see also 17 Indiana L. Encyclopedia Judgment § 111, Westlaw (database updated July 2025) ("Special findings of fact and conclusions of law by the trial court in ruling on a summary judgment are not binding on appeal and do not alter the appellate court's standard of review[.]") (footnotes omitted).

We hold that findings of fact made by a trial court in relation to a summary judgment ruling are not binding on appeal, nor do they alter our *de novo* standard of review regarding a summary judgment ruling.  Consistent with this holding, we overrule past decisions to the extent that they treat a trial court's unchallenged findings associated with summary judgment rulings as binding on the appellate court.  Accordingly, we overrule this aspect of the opinions in the following cases: Bremer v. Weeks, 104 Hawai'i 43, 63, 85 P.3d 150, 170 (2004) (reviewing the circuit court's grant of summary judgment, and treating unchallenged findings of fact on appeal as binding); Price v. AIG Hawai'i Insurance Co., 107 Hawai'i 106, 108 n.3, 110, 111 P.3d 1, 3 n.3, 5 (2005) (reviewing the circuit court's grant of summary judgment and citing the correct *de novo* standard of review, but treating an unchallenged finding of fact on appeal as binding); and 'Ōlelo: The Corporation for Community Television v. Office of Information Practices, 116 Hawai'i 337, 348-49, 173 P.3d 484, 495-96 (2007) (reviewing the circuit court's grant of summary judgment but treating unchallenged findings of fact on appeal as binding undisputed facts).

## B.   Statutory Interpretation

> Questions of statutory interpretation are questions of law
> to be reviewed *de novo* under the right/wrong standard.
>
> Our statutory construction is guided by the following well
> established principles:

19

> our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
>
> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists[.]
>
> In construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.
>
> This court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it to discover its true meaning.

Lingle v. Hawai'i Gov't Emps. Ass'n, AFSCME, Local 152, AFL-CIO, 107 Hawai'i 178, 183, 111 P.3d 587, 592 (2005) (internal quotation marks, brackets, and ellipses omitted) (quoting Guth v. Freeland, 96 Hawai'i 147, 149-50, 28 P.3d 982, 984-85 (2001)).

## C.   Constitutional Law

"We answer questions of constitutional law by exercising our own independent constitutional judgment based on the facts of the case. Thus, we review questions of constitutional law [de novo] under the right/wrong standard." West Maui Resort Partners LP v. Cnty. of Maui, 154 Hawai'i 121, 132, 547 P.3d 454, 465 (2024) (internal quotation marks omitted) (quoting Gardens at West Maui Vacation Club v. Cnty. of Maui, 90 Hawai'i 334, 339, 978 P.2d 772, 777 (1999)).

20

> "Issues of constitutional interpretation present questions of law that are reviewed *de novo*." Blair v. Harris, 98 Hawai'i 176, 178, 45 P.3d 798, 800 (2002) (citation omitted). In construing the constitution, this court observes the following basic principles:

>> Because constitutions derive their power and authority from the people who draft and adopt them, we have long recognized that the Hawaii Constitution must be construed with due regard to the intent of the framers and the people adopting it, and the fundamental principle in interpreting a constitutional provision is to give effect to that intent. This intent is to be found in the instrument itself.

>> The general rule is that, if the words used in a constitutional provision are clear and unambiguous, they are to be construed as they are written. In this regard, the settled rule is that in the construction of a constitutional provision the words are presumed to be used in their natural sense unless the context furnishes some ground to control, qualify, or enlarge them.

>> Moreover, a constitutional provision must be construed in connection with other provisions of the instrument, and also in the light of the circumstances under which it was adopted and the history which preceded it.

Hanabusa v. Lingle, 105 Hawai'i 28, 31-32, 93 P.3d 670, 673-74 (2004) (brackets omitted) (quoting Blair, 98 Hawai'i at 178-79, 45 P.3d at 800-01).

## IV. DISCUSSION

The Circuit Court granted summary judgment for the State, holding that the Territory's sale of government land with deed restrictions was an early form of use-zoning. The Circuit Court further concluded that the Deed Restriction was not voided by HRS § 515-6(b), and instead came within the exemption of that statute, and that the Deed Restriction did not violate the Hawai'i Establishment Clause or the Federal Establishment Clause.

21

In this appeal, Appellants challenge each of these Circuit Court rulings.  The parties agree that this case should be decided on summary judgment and based on the record before this court.

We conclude that HRS § 515-6(b) is not dispositive in this case.  Rather, the statute's applicability depends on the constitutionality of the Deed Restriction.  We further conclude that, given the evidence in the record, the sale of the Property in 1922 with the Deed Restriction was not an early form of use-zoning.  The record does not support the Circuit Court's determination in this regard.  Ultimately, we hold that the State's action to enforce the Deed Restriction, requiring that the Property be used "for Church purposes only" or else the Property would revert to the State, violates Hawai'i's Establishment Clause in article I, section 4 of the Hawai'i Constitution.  We resolve this appeal based on the Hawai'i Constitution.  In doing so, we need not consider the Federal Establishment Clause.

A.   **Hawai'i's Historical and Legal Landscape**

The subject Land Patent No. 8039 was issued by the Territory of Hawai'i in 1922, to Heber J. Grant, Trustee for the LDS Church.  A brief overview of the relevant historical and legal landscape is helpful to provide context for the 1922 Land Patent and the analysis of the issues before this court.

On July 7, 1898, the United States annexed Hawai'i with the passage of the Newlands Joint Resolution. See Newlands Resolution, H.R.J. Res. 259, 55th Cong., 30 Stat. 750 (1898) (**Newlands Resolution**). The Newlands Resolution "cede[d] and transfer[red] to the United States the absolute fee and ownership of all public, Government or Crown lands, . . . belonging to the Government of the Hawaiian Islands, together with every right and appurtenance thereunto appertaining[.]" Newlands Resolution, at 750; see Rice v. Cayetano, 528 U.S. 495, 505 (2000); Trustees of the Off. of Hawaiian Affs. v. Yamasaki, 69 Haw. 154, 159, 737 P.2d 446, 449 (1987). The Newlands Resolution also provided that:

> The existing laws of the United States relative to public lands shall not apply to such lands in the Hawaiian Islands; but the Congress of the United States shall enact special laws for their management and disposition[.]

Newlands Resolution, at 750.

Less than two years later, on April 30, 1900, the United States promulgated the Organic Act, which established Hawai'i as an incorporated territory of the United States. Act of April 30, 1900, Pub. L. No. 56-339, 31. Stat. 141 (**Organic Act**); see Rice, 528 U.S. at 505; Downes v. Bidwell, 182 U.S. 244, 305 (1901) (White, J., concurring) ("[O]n April 30, 1900, an act for the government of Hawaii was approved, by which the

Hawaiian islands were given the status of an incorporated territory[.]").

The Organic Act created a government for the Territory of Hawai'i and established the applicable law for the Territory. Section 5 of the Organic Act provided that "the Constitution . . . shall have the same force and effect within the said Territory as elsewhere in the United States[.]" Organic Act, at 141-42. Section 6 of the Organic Act stated that "the laws of Hawaii not inconsistent with the Constitution or laws of the United States or the provisions of this Act shall continue in force, subject to repeal or amendment by the legislature of Hawaii or the Congress of the United States." Id. at 142.

Given section 5 of the Organic Act and its legislative history, the U.S. Supreme Court recognized that "Congress thus expressed a strong desire to apply the Constitution [to the Territory of Hawai'i] without qualification." Duncan v. Kahanamoku, 327 U.S. 304, 318 (1946). For almost sixty years – between the passage of the Organic Act in 1900 and until Hawai'i's admission as a state in August 1959 - the Territory of Hawai'i was governed by the Constitution of the United States, the Organic Act (as amended), and the Revised Laws of Hawai'i (**RLH**) that were not inconsistent with the U.S. Constitution or the Organic Act.

Section 73 of the Organic Act (1915) entitled "Commissioner of Public Lands" granted authority to the Commissioner of Public Lands (**Commissioner**) and the Board of Public Lands (**Board**) to manage and dispose of government and crown lands classified as "public lands." See Organic Act, § 73, printed as amended in RLH (1915) at 47-51 (**Organic Act (1915)**). In 1922, when the Land Patent in this case was issued, **Section 73 of the Organic Act (1915)** provided in relevant part:[12]

> The Commissioner may also, with [the approval of the Governor], issue, for a nominal consideration, to any church or religious organization, or person or persons or corporation representing it, a patent for any parcel of public land occupied continuously for not less than five years heretofore and still occupied by it as a church site under the laws of Hawaii.
>
> No sale of lands for other than homestead purposes, except as herein provided, and no exchange by which the Territory shall convey lands exceeding either forty acres in area or five thousand dollars in value shall be made. No lease of agricultural lands exceeding forty acres in area, or of pastoral or waste lands exceeding two hundred acres in area, shall be made without the approval of two-thirds of the board of public lands which is hereby constituted, the members of which are to be appointed by the governor as provided in section eighty of this Act, and until the legislature shall otherwise provide said board shall consist of six members and its members be appointed for terms of four years: **Provided, however,** That the Commissioner may, with the approval of said board, sell for residence purposes lots and tracts, not exceeding three acres in area, and that sales of government lands may be made upon the approval of said board whenever necessary to locate thereon railroad rights of way, railroad tracks, side tracks, depot grounds, pipe lines, irrigation ditches, pumping stations, reservoirs, factories and mills and appurtenances thereto, including houses for employees, mercantile establishments, hotels, churches, and private

---

[12] The Organic Act was amended multiple times. In 1922, the applicable version of Section 73 was not divided into lettered paragraphs. Rather, paragraph demarcations for Section 73 were added in the 1925 version of the Organic Act, with materially similar language as the prior version of Section 73. For reference, the relevant paragraph in the 1925 version of the Organic Act is Section 73(k).

> schools; and all such sales shall be limited to the amount actually necessary for the economical conduct of such business or undertaking: **Provided further**, That no exchange of government lands shall hereafter be made without the approval of two-thirds of the members of said board, and no such exchange shall be made except to acquire lands directly for public uses.

Id. at 49-50 (emphases added).

Portions of Section 73 of the Organic Act (1915) appear to have been codified in RLH §§ 357 and 358 (1915).

In 1922, RLH § 357 (1915) addressed transfer of land to churches or religious organizations, stating:

> **Preference right to purchase, given when.  Patents to churches, etc.**
>
> . . . .
>
> The commissioner may also, with [the approval of the Governor], issue, for a nominal consideration, to any church or religious organization, or person or persons or corporation representing it, a patent for any parcel of public land occupied continuously for not less than five years heretofore and still occupied by it as a church site under the laws of Hawaii.  [Org. Act, pt. of s. 73.]

(Emphases added.)

In turn, in 1922, RLH § 358 (1915) appears to have codified other parts of Section 73 of the Organic Act.  RLH § 358 (1915) stated:

> **Sales, exchanges, and leases: purposes, limitations. Exchanges: how authorized.**  No sale of lands for other than homestead purposes, except as in this chapter provided, and no exchange by which the Territory shall convey lands exceeding either forty acres in area or five thousand dollars in value shall be made.  No lease of agricultural lands exceeding forty acres in area, or of pastoral or waste lands exceeding two hundred acres in area, shall be made without the approval of two-thirds of the board of public lands: **Provided**, however, that the commissioner may, with the approval of the board of public lands, sell for residence purposes lots and tracts, not exceeding three acres in area, and that sales of government lands may be made upon the approval of said board whenever necessary to locate thereon railroad rights of way, railroad tracks,

26

> side tracks, depot grounds, pipe lines, irrigation ditches, pumping stations, reservoirs, factories and mills and appurtenances thereto, <u>including houses for employees, mercantile establishments, hotels, churches, and private schools</u>, and all such sales shall be limited to the amount actually necessary for the economical conduct of such business or undertaking: **Provided**, further, that no exchange of government lands shall hereafter be made without the approval of two-thirds of the members of said board, and no such exchange shall be made except to acquire lands directly for public uses.  [Org. Act, pt. of s. 73.]

(Emphases added.)

As expressly referenced in the Land Patent issued to the LDS Church in this case, the Property was granted "in conformity with the provisions of Section 73" of the Organic Act, and "in pursuance of the provisions of Section 357 of the Revised Laws of the Territory of Hawaii of 1915[.]"

Thirty-seven years after the Land Patent in this case was issued, Hawai'i became a state on August 21, 1959.  See Hawai'i Admission Act, Pub. L. No. 86-3, § 7(c), 73 Stat. 4, 8 (1959) (**Admission Act**); Proclamation No. 3309, 35 Fed. Reg. 6868 (Aug. 21, 1959).  Hawai'i's Constitution became effective that same date, which included the Hawai'i Establishment Clause, stating in relevant part: "No law shall be enacted respecting an establishment of religion[.]"  Haw. Const. art. I, § 3 (1959).

**B.  The Evidence Does Not Establish That Sale of the Property with the Deed Restriction Was an Early Form of Use-Zoning**

In its summary judgment ruling, in FOF 3 and COL 18, the Circuit Court found that the practice of selling government lands with deed restrictions was an early form of use-zoning and

27

interpreted it as a historical practice of zoning.  Appellants argue that the record lacks any evidence, let alone substantial evidence, to support the State's claim that the Territory of Hawai'i utilized deed restrictions as a form of early zoning.  We agree.  The evidence in the record does not support the Circuit Court's FOF 3 or COL 18.

As part of its MSJ, the State submitted sixteen land patents issued to churches or religious associations (including for the subject Property) and one land patent issued to an individual for a cemetery site, all issued between 1921 to 1925. Each of the land patents contained a restriction similar to the Deed Restriction in this case; that is, the land was to be used for church purposes (or church and cemetery purposes) only, or the grant would become void and the land would revert to the Territory.  The State also attached ten maps to its MSJ, all of which are titled "Hawaii Territory Survey," with references to different locations on the islands of Hawai'i, Maui, Kaua'i, Moloka'i or O'ahu.  Some of the maps indicate they relate to homesteads, one map indicates it refers to government lots and remnants, and other maps have no such designation or are illegible.  To the extent that dates on the maps can be read (not all are legible), they appear to be dated between 1901 and 1923.  The State relies upon these exhibits to purportedly show how land was subdivided and zoned by the territorial government.

All of the State's exhibits were submitted pursuant to the declaration of the State's counsel, who attested that counsel had "personal knowledge of the facts contained in this declaration and [I] am competent to testify to them." Counsel's declaration then stated that each exhibit was a true and correct copy of the listed land patent or territorial map. No other information was provided. Given that each exhibit is a land patent or territorial map from about a hundred years ago, and neither counsel nor any other witness provides any basis to establish personal knowledge or that counsel was competent to testify to the matters in the declaration, it is doubtful that the exhibits were admissible under Rule 56(e) of the Hawai'i Rules of Civil Procedure (**HRCP**).[13] Nonetheless, Appellants did not challenge admission of the State's exhibits in the Circuit Court and make no such argument in this appeal. Therefore, Appellants have waived any challenge to the admission of the State's exhibits and we will consider them. See Querubin v. Thronas, 107 Hawai'i 48, 61 n.5, 109 P.3d 689, 702 n.5 (2005); Price, 107 Hawai'i at 110-12, 111 P.3d at 5-7 (holding that the

---

[13]     HRCP Rule 56(e) states in relevant part:

> **(e) Form of affidavits; further testimony; . . .** Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

plaintiff waived his argument that depositions in support of summary judgment were inadmissible, where plaintiff failed to challenge admissibility in the circuit court).

The land patents submitted by the State provide evidence that the Territorial Government sold property to other churches or religious institutions in a manner similar to the Property in this case. However, these land patents do not show or reflect an early form of use-zoning, as alleged by the State. Indeed, they do not demonstrate that territorial property was sold for other uses authorized under the Organic Act (1915) or RLH § 358 - such as for homestead, residence, employee housing, mercantile establishments, hotels, or school uses - in a similar way as churches. There is no land patent in evidence for these other uses, and thus nothing to establish that sales of land for these other uses were accompanied with restrictions similar to the Deed Restriction in this case. In short, sixteen of the land patents only show a pattern of how territorial land in the 1920s was sold to churches with restrictions and does not establish that land patents were used as an "early form of use-zoning," as found by the Circuit Court.

Additionally, the maps submitted by the State are illegible in many respects and are by no means self-explanatory. It can be discerned that the maps show certain areas on the islands of Hawai'i, Maui, Kaua'i, Moloka'i or O'ahu with varying

30

types of lots sketched in; some maps indicate they relate to homesteads, one indicates it related to government lots and remnants, another has a line stating "Kainalo School Lot Survey", and others have no such indication. There simply is no clarity or consistency as to what the maps actually show, the purpose for which they were prepared, where they were obtained, or whether they in fact show an "early form of use-zoning" by the Territorial Government in the 1920s. Further, nothing in the maps indicate restrictions on the use of properties for specified purposes or that properties could revert to the Territory.

The State prevailed on its summary judgment motion and thus was the movant. As the movant, the State had the initial burden of proof and we must view the State's exhibits in the light most favorable to the Appellants. French, 105 Hawai'i at 470, 99 P.3d at 1054; Ralston, 129 Hawai'i at 48, 292 P.2d at 1278. Here, based on summary judgment standards, the State did not carry its burden to establish that the practice of selling government lands with deed restrictions was an early form of use-zoning. We need not address Appellants' other arguments related to this conclusion. The Circuit Court erred in its FOF 3 and COL 18 rulings for the State.

C.    Statutory Analysis Under HRS § 515-6(b)

Appellants argue that the Deed Restriction on the Property should be voided based on, alternatively, HRS § 515-6(b), the Hawai'i Establishment Clause, or the Federal Establishment Clause.  "Courts generally will not decide a constitutional issue unless necessary to the determination of the merits of the cause under consideration."  Smith v. Smith, 56 Haw. 295, 304, 535 P.2d 1109, 1116 (1975) (citations omitted); see also State v. Lo, 66 Haw. 653, 657, 675 P.2d 754, 757 (1983) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, this court will decide only the latter." (citation, ellipsis, and brackets omitted)); State v. Poaipuni, 98 Hawai'i 387, 401, 49 P.3d 353, 367 (2002) (Moon, C.J., concurring) ("It is well-settled that important questions regarding the interpretation of constitutional provisions should ordinarily be decided only where such decisions are necessary to the resolution of a case." (citation omitted)).

Here, given Appellants' alternative grounds for challenging the Circuit Court's decision upholding the Deed Restriction, we first address their arguments under HRS § 515-

6(b) and conclude they do not prevail on this contention.[14]  In

granting the State's MSJ related to HRS § 515-6(b), the Circuit

Court concluded as follows:

> 10.   HRS § 515-6(b) states:
>
> > Every condition, restriction, or prohibition, including a right of entry or possibility of reverter, that directly or indirectly limits the use or occupancy of real property on the basis of race, sex, including gender identity or expression, sexual orientation, color, religion, marital status, familial status, ancestry, disability, age, or human immunodeficiency virus infection is void, <u>except</u> a limitation, on the basis of religion, on the use of real property held by a religious institution or organization or by a religious or charitable organization operated, supervised, or controlled by a religious institution or organization, and used for religious or charitable purposes.
>
> *Id.*
>
> 11.   HRS § 515-6(b) provides an exemption that permits any party to reserve a covenant for religious use when transacting with a religious organization.
>
> 12.   The [D]eed [R]estriction "for Church purposes only" is included in the exemption clause of HRS § 515-6(b).
>
> 13.   HRS § 515-6(b) does not void the [D]eed [R]estriction.

(Emphasis added.)

Appellants challenge the Circuit Court's ruling on HRS

§ 515-6(b) by arguing that they now own the Property and are <u>not</u>

religious institutions.  Thus, they assert, the Property is no

longer "held by a religious institution or organization," such

that the exemption clause in HRS § 515-6(b) does not apply, and

the statute voids the Deed Restriction.  It is undisputed that

---

[14]   There is no challenge in this case to the validity of HRS § 515-6(b), only whether the Circuit Court properly construed it.

neither Hilo Bay nor Keaukaha Ministry are religious institutions or organizations, that Keaukaha Ministry does not conduct religious activity on the Property, and that Keaukaha Ministry only uses its portion of the Property for cemetery purposes and not church purposes. There is also nothing in the record to indicate that Hilo Bay or Keaukaha Ministry are religious or charitable organizations operated, supervised, or controlled by a religious institution or organization.

As explained more fully below, we conclude that the Circuit Court erred in its interpretation, application, and ruling on HRS § 515-6(b). Appellants are correct that the record fails to show that the exemption clause in HRS § 515-6(b) is applicable. Thus, the State should not have prevailed with respect to HRS § 515-6(b). However, Appellants also cannot prevail under HRS § 515-6(b), because their argument completely ignores the requirements under the Deed Restriction. Where it is undisputed that Appellants are not religious institutions, they ignore whether they should own the Property in the first place, given the Deed Restriction. In this case, HRS § 515-6(b) does not resolve the dispute between the parties.

1. **Plain Language of HRS § 515-6(b)**

Interpretation of HRS § 515-6(b) is an issue of first impression and we start with the language of the statute.

34

Citizens Against Reckless Dev. v. Zoning Bd. of Appeals, 114 Hawai'i 184, 193, 159 P.3d 143, 152 (2007) ("[T]he fundamental starting point for statutory interpretation is the language of the statute itself . . . where the statutory language is plain and unambiguous, [the court's] sole duty is to give effect to its plain and obvious meaning." (citation omitted)).  Moreover, "[the court] must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose."  Lingle, 107 Hawai'i at 183, 111 P.3d at 592 (citation omitted).

HRS § 515-6(b) (2018) governing restrictive covenants and conditions provides, in relevant part:

> Every condition, restriction, or prohibition, including a right of entry or possibility of reverter, that directly or indirectly limits the use or occupancy of real property on the basis of . . . religion . . . is void, except a limitation, on the basis of religion, on the use of real property held by a religious institution or organization or by a religious or charitable organization operated, supervised, or controlled by a religious institution or organization, and used for religious or charitable purposes.

(Emphases added.)

The original version of HRS § 515-6 was passed in 1967 via Act 193.[15]  The stated purpose of Act 193 was to generally

---

[15] The original iteration of HRS § 515-6(b), adopted in 1967, was as follows:

> (b) Every condition, restriction, or prohibition, including a right of entry or possibility of reverter, which directly or indirectly limits the use or occupancy of real property on the basis of race, color, religion, or national origin, is void, except a limitation of use on the basis of religion of real property held by a religious

prohibit discrimination in connection with real property

transactions:

> The purpose of this Act is to secure for all individuals
> within the State freedom from discrimination because of
> race, color, religion, or national origin in connection
> with real property transactions, and thereby to protect
> their interest in personal dignity, to make available to
> the State their full productive capacities, to secure the
> State against domestic strife and unrest, to preserve the
> public safety, health, and general welfare, and to promote
> the interests, rights and privileges of individuals within
> the State.

1967 Haw. Sess. Laws Act 193, § 1 at 194-95.

The Senate Standing Committee Report from 1967,

indicates that the purpose of HRS § 515-6(b)'s exemption clause

was to benefit religious institutions: "Section 6 makes

restrictive covenants void, but this kind of limitation on use

or occupancy of real property is made permissible in exceptions

for the benefit of religious institutions." S. Stand. Comm.

Rep. No. 298, in 1967 Senate Journal, at 982.

Under HRS § 515-6(b), every restriction that directly

or indirectly limits the use or occupancy of real property on

the basis of religion is void, "<u>except</u> a limitation, on the

---

> institution or organization or by a religious or charitable
> organization operated, supervised, or controlled by a
> religious institution or organization, and used for
> religious or charitable purposes.

1967 Haw. Sess. Laws Act 193, § 6 at 196.

HRS § 515-6(b) was amended in later years to include other bases
of discrimination, including sex and ancestry (1971); physical handicap
(1976); marital status, parental status, and HIV (1989); age (1992); and
gender identity and expression and sexual expression (2005).

basis of religion, on the use of real property held by a religious institution or organization or by a religious or charitable organization operated, supervised, or controlled by a religious institution or organization, and used for religious or charitable purposes" (**exemption clause**).  (Emphasis added.)  In order for the exemption clause to apply to a religion-based restriction on real property, the subject property must be: (1) "held by a religious institution or organization <u>or</u> by a religious or charitable organization operated, supervised, or controlled by a religious institution or organization" <u>and</u> (2) "used for religious or charitable purposes."  HRS § 515-6(b) (emphases added).

Contrary to Appellants' arguments in this case, there is no language in HRS § 515-6(b) indicating that the legislature contemplated the provision to apply only to real property transactions *from specific grantors* in order to fall under the statute's purview.  Likewise, there are no references to other provisions that suggests that the legislature only intended the general voidance or exemption clauses to apply to deed restrictions imposed solely by religious institutions as grantors.

Rather, the exemption clause in HRS § 515-6(b) by its plain language specifies that the relevant inquiry, in assessing whether the exemption clause applies, hinges on whether (1) the

37

party <u>currently holding</u> the property is a "religious institution or organization or a religious or charitable organization operated, supervised, or controlled by a religious institution or organization, and" (2) the property is used for "religious or charitable purposes."  HRS § 515-6(b).  The word "held" in the statute should be construed as the past participle of the word "hold" which means "to have ownership or possession of[.]" *Hold*, <u>Merriam-Webster Dictionary</u>, https://www.merriam-webster.com/dictionary/hold [https://perma.cc/7ADJ-CD54].  Thus, when the exemption clause is read in full, a plain understanding and meaning of the phrase "real property held by a religious institution or organization" indicates that the real property must be currently or presently "own[ed] or possess[ed]" by a religious institution or organization, for the imposition of a religion-based restriction on real property to be within the exemption under the statute.  This interpretation aligns with the purpose underlying the HRS § 515-6(b) exemption clause to benefit religious institutions.

> **2.     The Circuit Court Erred by Granting Summary Judgment For the State on Appellants' Statutory Claim Under HRS § 515-6(b)**

Appellants' primary statutory argument is that they are not religious institutions, the exemption clause in HRS § 515-6(b) is thus not applicable to them, and therefore the Deed Restriction from 1922 must be voided by HRS § 515-6(b),

38

which was adopted in 1967. This argument puts the cart before the horse. It is based on the assumption that Appellants need not, in the first place, be concerned with complying with the Deed Restriction. If the Deed Restriction was followed, the Appellants apparently would be in breach because they contend they are not religious institutions, indicating they are not using the Property for church purposes. In turn, under the 1922 Land Patent, the Property would revert to the State.

Appellants appear to argue, nonetheless, that even if they violated a valid Deed Restriction, they are now the owners of the Property, they are not religious institutions, and thus the Deed Restriction can be voided by HRS § 515-6(b). As the State argues, this logic cannot stand. Rather, Appellants' argument under HRS § 515-6(b) boils down to whether they can properly hold the Property, which in turn requires that we address whether the Deed Restriction is constitutionally valid. If the Deed Restriction is constitutionally sound, Appellants cannot hold the Property if the Property is not being used for church purposes, and their argument under HRS § 515-6(b) is moot. If, on the other hand, the Deed Restriction is constitutionally invalid, then it cannot be enforced by the State and Appellants' arguments under HRS § 515-6(b) are also moot.

Hence, with respect to HRS § 515-6(b), it was not proper for the Circuit Court to grant summary judgment for either party based on this statutory provision. The Circuit Court erred in granting summary judgment for the State pursuant to HRS § 515-6(b).

## D.    Constitutional Analysis

The Hawai'i Establishment Clause, set forth in article I, section 4 of the Hawai'i Constitution, states: "No law shall be enacted respecting an establishment of religion[.]"[16]  The Hawai'i Establishment Clause is similar to the Federal Establishment Clause, which states: "Congress shall make no law respecting an establishment of religion[.]"  U.S. Const. amend. I, § 1.  The Federal Establishment Clause was made applicable to the states pursuant to the Fourteenth Amendment.  Cantwell v. Connecticut, 310 U.S. 296, 303 (1940) ("The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof.  The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws.");  Everson v. Board of Educ. of Ewing Twp., 330 U.S. 1, 8, 13

---

[16]    Article I, section 4 of the Hawai'i Constitution provides in full: "No law shall be enacted respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech or of the press or the right of the people peaceably to assemble and to petition the government for a redress of grievances."

(1947) (recognizing that the Fourteenth Amendment made the Federal Establishment Clause applicable to the states).

Appellants invoke both the Hawai'i Establishment Clause and the Federal Establishment Clause in asserting that the Deed Restriction is invalid.  In State v. Wilson, 154 Hawai'i 8, 13, 543 P.3d 440, 445 (2024), this court determined "that the proper sequence to consider matching constitutional text is to interpret the Hawai'i Constitution before its federal counterpart.  Only if the Hawai'i Constitution does not reach the minimum protection provided by a parallel federal constitutional right should this court construe the federal analogue."

We first address the Hawai'i Establishment Clause, and we hold that the Hawai'i Establishment Clause precludes the State from enforcing the Deed Restriction.

1.   **The Hawai'i Establishment Clause**

This court has "long recognized that the Hawai'i Constitution must be construed with due regard to the intent of the framers and the people adopting it, and the fundamental principle in interpreting a constitutional provision is to give effect to that intent.  This intent is to be found in the instrument itself."  Kaheawa Wind Power, LLC v. Cnty. of Maui, 146 Hawai'i 76, 87-88, 456 P.3d 149, 160-61 (2020) (citation omitted).  "Moreover, a constitutional provision must be

41

construed in connection with other provisions of the instrument, and also in the light of the circumstances under which it was adopted and the history which preceded it." Id. at 88, 456 P.3d at 161.

In State v. Kahlbaun, 64 Haw. 197, 638 P.2d 309 (1981), this court explained that if the text of a constitutional provision is ambiguous, extrinsic aids may be examined to determine the intent of the framers and the people adopting it. Id. at 201-02, 638 P.2d at 314.

> Another established rule of construction is that a court may look to the object sought to be accomplished and the evils sought to be remedied by the amendment, along with the history of the times and the state of being when the constitutional provision was adopted. In addition, we can also look to the understanding of the voters who adopted the constitutional provision[.]

Id. at 202, 638 P.2d at 315 (citations omitted); see also Nelson v. Hawaiian Homes Comm'n, 127 Hawai'i 185, 198, 277 P.3d 279, 292 (2012); Kalaeloa Ventures, LLC v. City & Cnty. of Honolulu, 143 Hawai'i 103, 109, 424 P.3d 458, 464 (2018); Huihui v. Shimoda, 64 Haw. 527, 531, 644 P.2d 968, 971 (1982); State v. Miyasaki, 62 Haw. 269, 281, 614 P.2d 915, 922 (1980); Hawaii Gov't Emps.' Ass'n v. Cnty. of Maui, 59 Haw. 65, 80-81, 576 P.2d 1029, 1039 (1978).

With these guiding principles we look to the intent of the framers and the voters who adopted the Hawai'i Establishment

Clause, the circumstances surrounding its promulgation, and the history of the times and the state of being when it was adopted.

In 1950, the Hawai'i Constitution was initially framed by a Constitutional Convention.  1949 Haw. Sess. Laws Act 334, § 1 at 661.  As this court concisely stated in Huihui:

> Delegates to the 1950 Constitutional Convention of Hawaii drafted this state's first constitution, which was ratified by the electorate in 1950 and later amended by the people and approved by Congress by Act of March 18, 1959, Pub. L. 86-3, 73 Stat. 4.  The constitution became the organic law of this state upon its admission into the Union on August 21, 1959.

64 Haw. at 530 n.3, 644 P.2d at 971 n.3.

The Hawai'i Establishment Clause originated as a part of Proposal Number 3, section 5 (**Section 5**), as introduced in the Constitutional Convention of Hawai'i of 1950.  Comm. Prop. No. 3 in 2 Proceedings of the Constitutional Convention of Hawai'i of 1950 (**Proceedings of 1950**), at 871 (1960).  Section 5 provided that: "No law shall be passed respecting the establishment of religion, or prohibiting the free exercise thereof."  Id.  The Committee of the Whole Report for Section 5 explained in its recommendation that:

> Since this section is derived from the first clause of the 1st Amendment to the Federal Constitution, with which your Committee is in full accord, it recommends the adoption of this section.  By doing so, this State will be availing itself of the decisions of the Federal Courts construing said clause of the Federal Constitution.

Comm. of the Whole Rep. No. 5 in 1 Proceedings of 1950, at 300 (emphases added).  Proposal Number 3 sections 5, 7, and 19, which individually passed their first and second readings

43

unanimously, were ultimately combined by the Committee on Style

to create article I, section 3, which read:

> SECTION 3. Freedom of Religion, Speech, Press, Assembly and Petition. No law shall be enacted respecting an establishment of religion or prohibiting the free exercise thereof, or abridging the freedom of speech or of the press, or the right of the people peaceably to assemble and to petition the government for a redress of grievances.

Stand. Comm. Rep. No. 88 in 1 Proceedings of 1950, at 244-45

(brackets omitted). The Committee on Style reasoned that the

purpose for combining those sections into one single section was

"(1) [t]o bring related matters together, and (2) [t]o follow

the more traditional practice of the Federal Constitution." Id.

at 243 (formatting altered).

On June 14, 1950, article I, section 3 unanimously

passed third reading, as amended by the Committee on Style. See

1 Proceedings of 1950, at 99.

The Hawai'i Constitution went into effect on August 21,

1959, as amended by Congress.[17] Proclamation No. 3309, 35 Fed.

---

[17] Following the 1950 Constitutional Convention, the Hawai'i Constitution was "adopted by a vote of the people of [Hawai'i] in an election held on November 7, 1950[.]" See Proclamation No. 3309, 35 Fed. Reg. 6868 (Aug. 21, 1959). On March 18, 1959, Congress approved the 1950 Hawai'i Constitution, contingent on proposed amendments to be submitted to the people of Hawai'i for a vote – none of which are relevant to this case. Admission Act, Pub. L. No. 86-3, § 7(b), 73 Stat. 4, 7-8 (1959). Congress' proposed amendments were subsequently adopted by the people of Hawai'i at an election held on June 27, 1959.

After the Hawai'i Constitution went into effect in 1959, there were no substantive amendments to the Hawai'i Establishment Clause. The provision was renumbered from article I, section 3 to article I, section 4 following the 1978 Constitutional Convention, after a new section was added to the Hawai'i Constitution. See State Constitution in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 1148-49 (1980).

Reg. 6868 (Aug. 21, 1959); see Admission Act, Pub. L. No. 86-3, § 7(b), 73 Stat. 4, 7-8 (1959).

With this historical context, the framers' intent regarding Hawai'i's Establishment Clause is best articulated by the Committee of the Whole Report during the 1950 Constitutional Convention.  The committee first stated that the provision was based on the Federal Establishment Clause, with which the committee was "in full accord."  Comm. of the Whole Rep. No. 5 in 1 Proceedings of 1950, at 300.  The committee recommended adoption of the proposal because "[b]y doing so, this State will be availing itself of the decisions of the Federal Courts construing said clause of the Federal Constitution."  Id.  In 1950, the proposed language was "No law shall be passed respecting the establishment of religion[.]"  Ultimately, the Hawai'i Establishment Clause, promulgated as part of Hawai'i's Constitution in 1959, states: "No law shall be enacted respecting an establishment of religion[.]"  Haw. Const. art. I, § 4.  We find nothing in the history between 1950 and 1959, or the two-word difference between the original proposal and the final version of the Hawai'i Establishment Clause, to suggest a different intent from what was stated by the Committee of the Whole in 1950.

In light of the guidance from the framers, we next consider federal court decisions regarding the Federal

45

Establishment Clause, before and in the time period our state constitution was proposed, adopted by the electorate, and became effective.  Such case law provides the best indication of what the framers and voters intended by proposing and adopting the Hawai'i Establishment Clause.  Moreover, this approach is consistent with this court's long-standing principles in construing our state constitution to consider "the history of the times and the state of being when [a] constitutional provision was adopted."  Kahlbaun, 64 Haw. at 202, 638 P.2d at 315; see also Kaheawa Wind Power, LLC, 146 Hawai'i at 87-88, 456 P.3d at 160-61.

Ultimately, however, when we consider federal law regarding textually similar constitutional provisions, we must decide the best course for our state under the Hawai'i Constitution:

> As the ultimate judicial tribunal in this state, this court has final, unreviewable authority to interpret and enforce the Hawaii Constitution.  We have not hesitated in the past to extend the protections of the Hawaii Bill of Rights beyond those of textually parallel provisions in the Federal Bill of Rights when logic and a sound regard for the purposes of those protections have so warranted.

State v. Tanaka, 67 Haw. 658, 661-62, 701 P.2d 1274, 1276 (1985) (internal quotation marks and brackets omitted) (quoting State v. Kaluna, 55 Haw. 361, 369, 520 P.2d 51, 58 (1974)); see also Huihui, 64 Haw. at 531, 644 P.2d at 971.

46

2.      **The Hawai'i Establishment Clause Precludes the State From Enforcing the Deed Restriction**

When the Hawai'i Constitution was framed and subsequently went into effect, three U.S. Supreme Court cases delineated the law under Federal Establishment Clause jurisprudence: Everson v. Board of Educ. of Ewing. Township, 330 U.S. 1 (1947); McCollum v. Board of Educ., 333 U.S. 203 (1948); and Zorach v. Clauson, 343 U.S. 306 (1952).[18]  We conclude that these decisions provide appropriate and ample guidance to decide this case.[19]  We introduce each case, in turn, before analyzing the Deed Restriction under the Hawai'i Establishment Clause.

In 1947, three years before the 1950 Constitutional Convention in Hawai'i, the U.S. Supreme Court issued its landmark Federal Establishment Clause decision in Everson, 330 U.S. 1. Everson is considered a seminal case which "set the course of Establishment Clause decisions for two generations."  John C. Jeffries, Jr. & James E. Ryan, A Political History of the Establishment Clause, 100 Mich. L. Rev. 279, 284-87 (2001); see also Daniel O. Conkle, Toward a General Theory of the Establishment Clause, 82 Nw. U. L. Rev. 1113, 1124-25 (1988).

---

[18]     Although the Federal Establishment Clause was adopted as part of the Bill of Rights in the U.S. Constitution in 1791, there were only a few cases dealing with the clause prior to the 1940s – none of which are germane to the issues presently before this court.

[19]     Although we focus on these cases to resolve the issues presented in this case, we are not limited to considering only these cases in future challenges under the Hawai'i Establishment Clause.

In Everson, the U.S. Supreme Court articulated

fundamental principles of the Federal Establishment Clause:

> The 'establishment of religion' clause of the First
> Amendment means at least this: Neither a state nor the
> Federal Government can set up a church.  Neither can pass
> laws which aid one religion, aid all religions, or prefer
> one religion over another.  Neither can force nor influence
> a person to go to or to remain away from church against his
> will or force him to profess a belief or disbelief in any
> religion.  No person can be punished for entertaining or
> professing religious beliefs or disbeliefs, for church
> attendance or non-attendance.  No tax in any amount, large
> or small, can be levied to support any religious activities
> or institutions, whatever they may be called, or whatever
> form they may adopt to teach or practice religion.  Neither
> a state nor the Federal Government can, openly or secretly,
> participate in the affairs of any religious organizations
> or groups and vice versa.  In the words of Jefferson, the
> clause against establishment of religion by law was
> intended to erect 'a wall of separation between Church and
> State.'

330 U.S. at 15-16 (citation omitted).  The Supreme Court held

that a state statute authorizing school districts to pay for

transportation of parochial school students, as part of a

general program to pay fares for students attending public and

other schools, did not violate the Federal Establishment Clause.

Id. at 17.  The Court explained:

> It is undoubtedly true that children are helped to get to
> church schools.  There is even a possibility that some of
> the children might not be sent to the church schools if the
> parents were compelled to pay their children's bus fares
> out of their own pockets when transportation to a public
> school would have been paid for by the State.  The same
> possibility exists where the state requires a local transit
> company to provide reduced fares to school children
> including those attending parochial schools, or where a
> municipally owned transportation system undertakes to carry
> all school children free of charge.  Moreover, state-paid
> policemen, detailed to protect children going to and from
> church schools from the very real hazards of traffic, would
> serve much the same purpose and accomplish much the same
> result as state provisions intended to guarantee free
> transportation of a kind which the state deems to be best

48

> for the school children's welfare.  And parents might refuse to risk their children to the serious danger of traffic accidents going to and from parochial schools, the approaches to which were not protected by policemen.  Similarly, parents might be reluctant to permit their children to attend schools which the state had cut off from such general government services as ordinary police and fire protection, connections for sewage disposal, public highways and sidewalks.  Of course, cutting off church schools from these services, so separate and so indisputably marked off from the religious function, would make it far more difficult for the schools to operate.  But such is obviously not the purpose of the First Amendment.  That Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary.  State power is no more to be used so as to handicap religions, than it is to favor them.

Id. at 17-18 (emphasis added) (footnote omitted).

A year later, in McCollum, 333 U.S. 203, the U.S. Supreme Court struck down a public school program in Champaign, Illinois, that allowed religious instructors to enter public school classrooms during regular school hours to provide thirty-minutes of religious teaching to students whose parents consented to their participation in the program.  Id. at 205-06. There was no state statute that expressly authorized this program.  See id. at 206.  Rather, the subject program was permitted by the Champaign Board of Education, which under Illinois statutes had general supervisory powers over the use of public school buildings in the Champaign school district.  Id. at 205.  Under the program, students choosing to attend religious instruction were released from secular study, while students choosing not to attend were required to go to another class for secular studies.  Id. at 209.

49

In concluding that the school program ran afoul of the Federal Establishment Clause, the U.S. Supreme Court explained:

> The foregoing facts . . . show the use of tax-supported property for religious instruction and the close cooperation between the school authorities and the religious council in promoting religious education. The operation of the state's compulsory education system thus assists and is integrated with the program of religious instruction carried on by separate religious sects. Pupils compelled by law to go to school for secular education are released in part from their legal duty upon the condition that they attend the religious classes. This is beyond all question a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith. And it falls squarely under the ban of the First Amendment (made applicable to the States by the Fourteenth) as we interpreted it in [Everson][.]
>
> . . . .
>
> [T]he First Amendment rests upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere. Or, as we said in the [Everson] case, the First Amendment had erected a wall between Church and State which must be kept high and impregnable.
>
> Here not only are the state's [tax-supported] public school buildings used for the dissemination of religious doctrines. The State also affords sectarian groups an invaluable aid in that it helps to provide pupils for their religious classes through use of the state's compulsory public school machinery. This is not separation of Church and State.

Id. at 209-10, 212.

Of note in McCollum, the Champaign Board of Education sought to dismiss the appeal by asserting that the Illinois Supreme Court's decision, from which the appeal was taken, did not raise a question about the validity of a state statute for jurisdictional purposes. Id. at 206. However, the U.S. Supreme Court held:

> This contention rests on the admitted fact that the challenged program of religious instruction was not

50

> expressly authorized by statute. But the State Supreme
> Court has sustained the validity of the program on the
> ground that the Illinois statutes granted the board
> authority to establish such a program. This holding is
> sufficient to show that the validity of an Illinois statute
> was drawn in question within the meaning of 28 U.S.C. s
> 344(a), 28 U.S.C.A. s 344(a).

Id. (emphases added).

In 1952, the U.S. Supreme Court decided Zorach, 343 U.S. 306. There, the Court upheld a New York City program which allowed public schools, upon written request from parents, to release students during the school day from school grounds to attend religious instruction or devotional exercises elsewhere. Id. at 308. The Court ruled that the program did not violate the Federal Establishment Clause, reasoning that, unlike McCollum, the program did not involve religious instruction in public school classrooms, the expenditure of public funds, nor coercion by school authorities. Id. at 308-09, 311. The Court further explained:

> Government may not finance religious groups nor undertake
> religious instruction nor blend secular and sectarian
> education nor use secular institutions to force one or some
> religion on any person. But we find no constitutional
> requirement which makes it necessary for government to be
> hostile to religion and to throw its weight against efforts
> to widen the effective scope of religious influence. The
> government must be neutral when it comes to competition
> between sects. It may not thrust any sect on any person.
> It may not make a religious observance compulsory. It may
> not coerce anyone to attend church, to observe a religious
> holiday, or to take religious instruction. But it can
> close its doors or suspend its operations as to those who
> want to repair to their religious sanctuary for worship or
> instruction. No more than that is undertaken here.
>
> . . . .
>
> In the McCollum case the classrooms were used for religious
> instruction and the force of the public school was used to

51

> <u>promote that instruction</u>. Here, as we have said, the public schools do no more than accommodate their schedules to a program of outside religious instruction. We follow the <u>McCollum</u> case. But we cannot expand it to cover the present released time program unless separation of Church and State means that public institutions can make no adjustments of their schedules to accommodate the religious needs of the people. We cannot read into the Bill of Rights such a philosophy of hostility to religion.

<u>Id.</u> at 314-15 (emphases added) (footnote omitted).

With the above guiding principles in mind, we assess the constitutionality of enforcing the Deed Restriction under the Hawai'i Establishment Clause. We first consider the state action in this case covered by the Hawai'i Establishment Clause, adopted in 1959, thirty-seven years after the subject Land Patent was issued. The State, through the Department of Land and Natural Resources (**DLNR**), asserts its rights under the Deed Restriction. The State has admitted to paragraphs 5 and 9 in the Second Amended Complaint, which state:

> 5. The State has refused to remove the Church purposes restriction and reversionary interest from the properties and continues to claim that the clause is enforceable and the properties should revert to the State if the restriction is not satisfied.
>
> . . . .
>
> 9. State is the State of Hawaii as successor to the Territory of Hawaii and purports to hold a reversionary interest in at least a portion of the Property.

HRS § 171-3 (2011) establishes DLNR's broad authority, and states in relevant part: "The department shall manage, administer, and exercise control over public lands, . . . and all other interests therein and exercise such powers of

disposition thereof as may be authorized by law."  Given its admissions, the State through DLNR seeks to enforce the church-purposes Deed Restriction, and its power to seek such enforcement flows from its broad statutory authority.

These circumstances are similar to McCollum in that there is no statute expressly authorizing the challenged action in this case, but the action was undertaken under broad statutory authority.  In McCollum, Illinois statutes gave district boards of education general supervisory powers over public school buildings, and the Champaign Board of Education used this power to allow religious groups to conduct religious teaching in public school buildings.  333 U.S. at 205.  In addressing its jurisdiction in the case, the U.S. Supreme Court stated that the Illinois Supreme Court had "sustained the validity of the program on the ground that the Illinois statutes granted the board authority to establish such a program.  This holding is sufficient to show that the validity of an Illinois statute was drawn in question within the meaning of 28 U.S.C. s 344(a), 28 U.S.C.A. s 344(a)."  Id. at 206.  Although addressed in the context of its jurisdiction, the Court in McCollum recognized that state action under broad statutory powers will trigger Establishment Clause scrutiny, as it held that the school program in that case violated the Federal Establishment Clause.  Id. at 209-12.  Similarly, we conclude that the State's

53

actions seeking to enforce the church-purposes Deed Restriction in this case implicates scrutiny under the Hawai'i Establishment Clause.

Turning to the question of whether the State's action to enforce the Deed Restriction violates the Hawai'i Establishment Clause, we conclude that it does. Everson is most instructive, delineating important standards under which to assess whether Establishment Clause principles are violated, including that:

> Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. . . . Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between Church and State.'

330 U.S. at 15-16 (citation omitted).

Everson further declared that Establishment Clause principles "require[] the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions, than it is to favor them." Id. at 18 (emphasis added.)

Here, the State's action of enforcing the Deed Restriction runs afoul of the tenets expressed in Everson. The Deed Restriction requires that the Property be used "for Church

purposes only" or else the Property reverts to the State.  By seeking to enforce this provision the State brings to bear its powers to ensure that the Property continues being used for "Church purposes."  This constitutes direct state aid in support of religion.

Like the coercion and entanglement concerns expressed in the context of public education in <u>Everson</u> and <u>McCollum</u>, the Deed Restriction in this case also requires the State to assess and determine whether Appellants are using the Property "for Church purposes only."  <u>See</u> <u>Everson</u>, 220 U.S. at 16 ("Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa."); <u>McCollum</u>, 333 U.S. at 216-17 (discussing the history and import of the separation of public education from "Church entanglements" to, among other things, protect "religion from censorship and coercion however subtly exercised").  The "church-purposes" Deed Restriction and the State's enforcement of it, places the State in the role of actively policing what constitutes a "Church purpose."  Such a role is fraught with innumerable ways that the State would be thrust into the business of religion and religious institutions. "Church" is commonly defined as "a building for public and especially Christian worship."  *Church*, <u>Merriam-Webster Dictionary</u>, https://www.merriam-webster.com/dictionary/church

[https://perma.cc/5LS4-VAL3]. Clearly, the State cannot enforce the Deed Restriction only in favor of Christian worship. See Everson, 330 U.S. at 511 ("Neither a state nor the Federal Government can . . . pass laws which aid one religion, aid all religions, or prefer one religion over another."). Even with a broader notion of "church" and given the breadth of worship, faith, and beliefs among different people, the State's enforcement of the Deed Restriction requires it to assess and make judgment calls as to what a "church purpose" entails. Rather than a wall of separation between church and state, this is the opposite and causes an entanglement between church and state. We conclude that the State's involvement in determining what constitutes "Church purposes" under the Deed Restriction in this case violates the Hawai'i Establishment Clause.

Moreover, enforcement of the Deed Restriction is not a neutral act as between religion and non-religion. Rather, the Deed Restriction explicitly favors religion, requiring any owners of the Property to continue using it only for "Church purposes" or they will lose the Property. Hence, the State's authority is directly utilized to support religion. See Zorach, 343 U.S. at 315 (noting that in McCollum, public school "classrooms were used for religious instruction and the force of the public school was used to promote that instruction" (emphasis added)).

Based on the foregoing, we hold that the Hawai'i Establishment Clause precludes the State from enforcing the Deed Restriction.

3.    **We Decline to Adopt the Tests Asserted by the Parties**

Appellants assert that the test articulated by the U.S. Supreme Court in Lemon, 403 U.S. 602, is the appropriate test for deciding constitutional infirmity under the Hawai'i Establishment Clause.  The State, on the other hand, argues that the Lemon test has been abandoned by the U.S. Supreme Court and asserts that we should adopt the now-prevailing test for Federal Establishment Clause challenges in Kennedy, 597 U.S. 507.  We decline to adopt either the Lemon or the Kennedy tests.

In Lemon, the U.S. Supreme Court stated:

In the absence of precisely stated constitutional prohibitions, we must draw lines with reference to the three main evils against which the Establishment Clause was intended to afford protection: 'sponsorship, financial support, and active involvement of the sovereign in religious activity.'  [Walz v. Tax Comm'n, 397 U.S. 664, 668 (1970)].

Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years.  Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, [Board of Educ. v. Allen, 392 U.S. 236, 243 (1968)]; finally, the statute must not foster 'an excessive government entanglement with religion.' [Walz, 397 U.S. at 674].

403 U.S. at 612-13 (emphases added).[20]  Appellants assert that

the Lemon test should apply for purposes of the Hawai'i

Establishment Clause because it was discussed in the Hawai'i

Constitutional Convention Studies of 1978.

The LRB drafted the 1978 Studies as a guidance

document to the delegates of the 1978 Constitutional Convention.

The 1978 Studies "were undertaken at the direction of the

legislature and are an attempt to present in understandable form

many of the possible issues and the arguments on both sides of

such issues that the delegates to the Constitutional Convention

of 1978 may wish to consider."  Hawai'i Constitutional Convention

Studies 1978: Introduction and Article Summaries, at 1 (1978).

Appellants contend that the 1978 Studies, as well as

Standing Committee Report No. 39 of the 1978 Constitutional

Convention (related to a different section of the Hawai'i

Constitution),[21] demonstrate that "the delegates to the 1978

---

[20]     Although we do not adopt the test articulated in Lemon, we
recognize some of its principles stem from and are consistent with Everson,
McCollum and Zorach.

[21]     Standing Committee Report No. 39, *inter alia*, discussed article
X, section I of the Hawai'i Constitution (then article XI, section I), a
constitutional provision that, according to the report, "prohibits the use of
public funds for the support or benefit of any sectarian or private
educational institution."  See Stand. Comm. Rep. No. 39 in 1 Proceedings of
the Constitutional Convention of Hawai'i of 1978, at 587-88 (1980).  The
Standing Committee Report included the following excerpted sentence: "The
application of the federal constitution's prohibition against entanglement of
the church and state to the issue was also discussed."  Id. at 588.  While
the Standing Committee Report did not directly mention Lemon, Appellants
maintain that the report, and the excerpted sentence in particular,
"illustrate[] that fears of entanglement, in violation of [Lemon], materially

Constitutional Convention understood [Lemon] to be the controlling test for [Hawai'i's] [E]stablishment [C]lause." Appellants argue that "by declining to substantively amend the [Hawai'i Establishment Clause], the delegates approved [Lemon] as the applicable test in 1978."

None of Appellants' arguments for adopting the Lemon test are convincing. There is no indication that the 1978 convention delegates approved the Lemon test or impliedly endorsed it. The 1978 Studies are guidance documents and are not reflective of the discussions or ideas of the 1978 convention delegates themselves. The 1978 Studies preceded the 1978 Constitutional Convention, and the LRB which created the 1978 Studies is a legislative service agency. Further, the substance of the Hawai'i Establishment Clause was not amended in 1978, nor is there any indication that the convention delegates contemplated Lemon in any debates or proceedings during the 1978 convention. Simply because the 1978 Studies were available does not mean they were relied upon by the delegates. There being no substantive action by the 1978 convention delegates regarding the Hawai'i Establishment Clause, and there being no indication that the delegates actually considered or debated the 1978 Studies, we conclude that the delegates did not approve or

influenced the delegates' determination of allowable interaction with religion."

endorse the contents of that study such that we should adopt the Lemon test.

Next, we address the State's argument that we should adopt the "historical practices and understandings" test adopted by the U.S. Supreme Court in Kennedy in 2022.  In Kennedy, the U.S. Supreme Court held that a high school football coach had been improperly suspended for kneeling midfield after games to offer a "quiet prayer" during a period when school employees were free to attend to personal matters.[22]  597 U.S. at 512-14.  Regarding the proper analysis under the Federal Establishment Clause, Kennedy states that the U.S. Supreme Court "long ago abandoned Lemon and its endorsement test offshoot."  597 U.S. at 534.  Instead, Kennedy instructs that "the Establishment Clause must be interpreted by reference to historical practices and understandings."  597 U.S. at 535 (emphasis added) (internal quotation marks omitted) (citing Town of Greece v. Galloway, 572 U.S. 565, 576 (2014)).  The Kennedy decision provides little direct guidance, but drew on past U.S. Supreme Court

---

[22]    The dissent in Kennedy strongly disagreed with the majority's assessment of the record, stating that the coach's practice evolved over time to where a majority of the football team joined him and the coach would deliver speeches with overtly religious references.  597 U.S. at 546, 549 (Sotomayor, J., dissenting).

Establishment Clause cases where the Court utilized a history-focused approach,[23] in order to emphasize that:

> The line that courts and governments must draw between the permissible and the impermissible <u>has to accord with history and faithfully reflect the understanding of the Founding Fathers</u>.  An analysis focused on original meaning and history, this Court has stressed, has long represented the rule rather than some 'exception' within the Court's Establishment Clause jurisprudence.

<u>Id.</u> at 535-36 (emphasis added) (citations, brackets, and quotation marks omitted).

Here, the State argues that this court likewise should reject <u>Lemon</u> and adopt <u>Kennedy</u> for purposes of interpreting the Hawai'i Establishment Clause.  Citing <u>Koolau Baptist Church</u>, 68 Haw. 410, 718 P.2d 267, the State asserts that this court has interpreted the Hawai'i Establishment Clause "co-extensively with the First Amendment of the United States Constitution."  The State mistakenly relies on <u>Koolau Baptist Church</u> because that case only addressed the Federal Establishment Clause, not the Hawai'i Establishment Clause.  <u>See</u> <u>id.</u> at 412, 419-21, 718 P.2d at 268, 273-75.

---

[23]    In articulating its new historical practices and understandings test, the <u>Kennedy</u> majority cited to a group of pre-<u>Lemon</u> cases where the Court dealt with Establishment Clause challenges in historical terms, and appeared to suggest that the approach in those cases should inform Establishment Clause analyses going forward under <u>Kennedy</u>.  <u>See</u> <u>Kennedy</u>, 597 U.S. 507, 535-36 (citing <u>Town of Greece</u>, 572 U.S. at 575-77 (analyzing the federal historical practice of legislative prayer)); <u>American Legion v. American Humanist Ass'n</u>, 588 U.S. 29, 58-60 (2019) (analyzing the history of religious monuments); <u>Torcaso v. Watkins</u>, 367 U.S. 488, 490-91 (1961) (analyzing the history of religious oaths); <u>McGowan v. Maryland</u>, 366 U.S. 420, 431-40 (1961) (analyzing the history of Sunday closing laws); <u>Walz</u>, 397 U.S. at 668-80 (analyzing the "history and uninterrupted practice" of tax exemptions for churches).

We also note Justice Sotomayor's dissent in Kennedy criticizing the majority's opinion for its lack of pointed guidance, and its emphasis on the application of "history and tradition" to resolve challenges under the Federal Establishment Clause:

> [T]he Court rejects longstanding concerns surrounding government endorsement of religion and replaces the standard for reviewing such questions with a new "history and tradition" test. . . . This decision does a disservice . . . to our Nation's longstanding commitment to the separation of church and state. . . .
>
> . . . .
>
> The Court reserves any meaningful explanation of its history-and-tradition test for another day, content for now to disguise it as established law and move on. It should not escape notice, however, that the effects of the majority's new rule could be profound. The problems with elevating history and tradition over purpose and precedent are well documented. [See Dobbs v. Jackson Women's Health Org., 597 U.S. 215, 374-75 (2022) (Breyer, Sotomayor, and Kagan, JJ., dissenting)] (explaining that "the Framers defined rights in general terms, to permit future evolution in their scope and meaning"); [New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 103-112 (2022) (Breyer, J., dissenting)] (explaining the pitfalls of a "near-exclusive reliance on history" and offering examples of when this Court has "misread" history in the past); [Brown v. Davenport, 596 U.S. 118, 152-53 (2022) (Kagan, J., dissenting)] (noting the inaccuracies risked when courts "play amateur historian").

Kennedy, 597 U.S. at 546-47, 573 (Sotomayor, J., dissenting).

In this same vein, other U.S. Supreme Court justices have admonished tests that require judges to play the role of "amateur historian" in attempting to resolve legal disputes. See, e.g., Brown, 596 U.S. at 149, 152 (Kagan, J., dissenting) (noting "the peril of looking at history through a 21st-century

lens" and the inaccuracies risked when courts "play amateur historian").[24]

Further, this court has not shied away from critiquing and illuminating the risks inherent in requiring judges to adopt independent historical research roles.  See Wilson, 154 Hawai'i at 21-22, 543 P.3d at 453-54 (critiquing the U.S. Supreme Court for misusing history to flip its long-held understandings and interpretations of critical issues including gun control and women's reproductive rights).

We see no reason to adopt the Kennedy test to analyze the Hawai'i Establishment Clause.  We recognize the well-founded concerns raised by Justice Sotomayor's dissent in Kennedy, highlighting the challenges of unearthing and applying historical practices and understandings from the period around the U.S. Constitution's adoption in 1787.  Further, Appellants make the salient point that applying the Kennedy test in the context of state actions in Hawai'i is even more fraught with questions and peril.  It would be discordant to require that the Hawai'i Establishment Clause be construed based on the historical

_____

[24] Appellants' opening brief also points to a law review article supporting their contention that the Kennedy historical practices and understandings test "fatally presumes that all historical governmental acts are consistent with constitutional requirements" despite history indicating that "government often engages in unconstitutional activities."  See Alex J. Luchenitser & Sarah R. Goetz, A Hollow History Test: Why Establishment Clause Cases Should Not Be Decided Through Comparisons with Historical Practices, 68 Cath. U. L. Rev. 653, 666-70 (2019) (noting various historical state and federal government acts that were subsequently deemed unconstitutional).

practices and understandings of the Founding Fathers given that the Hawai'i Constitution was adopted by its electorate in 1959, one-hundred and seventy-two years after the U.S. Constitution was adopted.

Further, in the context of this case, the practice in question is the grant of property with a church-purposes deed restriction in 1922, when Hawai'i was a territory and decades before the Hawai'i Constitution was framed or adopted.  The State's position in this case, in part, is that the Deed Restriction here passes muster because under a Kennedy analysis, it is part of our State's historical practices as an early form of land use regulation.  We reject that notion because the record in this case, discussed above, does not support the State's contention that church-purposes deed restrictions were part of an early form of use-zoning in the Territory of Hawai'i.  Further, there is nothing in the record to indicate that the framers of the Hawai'i Constitution or the electorate considered such state actions as consistent with the Hawai'i Establishment Clause adopted in 1959.

E.    Federal Establishment Clause

In light of our holding under the Hawai'i Establishment Clause that the State is precluded from enforcing the Deed Restriction, the questions under the Federal Establishment

Clause need not be addressed.  See <u>Wilson</u>, 154 Hawai'i at 13, 543 P.3d at 445.

The Circuit Court held that the Deed Restriction did not violate the Federal Establishment Clause.  Because we rule based on state constitutional grounds and the Federal Establishment Clause need not be reached in this case, we vacate that ruling.  See <u>Michigan v. Long</u>, 463 U.S. 1032, 1040-42 (1983).

## V.    CONCLUSION

Based on the Hawai'i Establishment Clause, we reverse the Circuit Court's summary judgment ruling for the State, and hold that summary judgment is warranted for Appellants Hilo Bay and Keaukaha Ministry.  The State is precluded from enforcing the Deed Restriction by the Hawai'i Establishment Clause.  The Circuit Court's ruling under the Federal Establishment Clause is vacated.

Kenneth R. Kupchak                  /s/ Mark E. Recktenwald
Clint K. Hamada
for plaintiffs-appellants           /s/ Sabrina S. McKenna

Julie H. China                      /s/ Todd W. Eddins
Miranda C. Steed
Deputy Attorneys General            /s/ Lisa M. Ginoza
for defendants-appellees

                                    /s/ Vladimir P. Devens

